M. Diane KOKEN, Insurance Commissioner of the Commonwealth of Pennsylvania,

v.

FIDELITY MUTUAL LIFE
INSURANCE COMPANY.

Commonwealth Court of Pennsylvania.

Heard July 16, 19, 1999, Aug. 9–
10, 1999, and Sept. 21, 1999.
Decided May 22, 2002.
Publication Ordered June 14, 2002.

Thomas A. Leonard, Richard A. Limburg and E. Perry Warner, Philadelphia, for petitioner.

Gary R. Leadbetter, Norristown, for respondent.

Robert H. Levin, Philadelphia, for policyholder's Committee.

Clare Ann Fitzgerald, Philadelphia for Capital Analysts.

Michael W. McTigue, Jr., Philadelphia, for Tri-Links Inv. Trust, Kesington Intern. Ltd. and Springfield Assoc., LLC.

Opinion by President Judge COLINS.

Before the Court for disposition is the request of the Insurance Commissioner of Pennsylvania, as statutory Rehabilitator of the Fidelity Mutual Life Insurance Company (Fidelity Mutual),[1] for approval of her Third Amended Plan of Rehabilitation, as modified (Plan).[2] Objections to the Plan have been filed by the Policyholders' Committee that was appointed by the Court early on in these proceedings.

Only the most cursory history of these lengthy and complicated proceedings is necessary to our purposes here. Suffice it to say that, on the basis of its precarious financial position, Fidelity Mutual was placed in rehabilitation, at the request of the Insurance Commissioner and Fidelity Mutual, by Order of November 6, 1992. The Rehabilitator submitted her original rehabilitation plan to the Court on June 30, 1994, some two years after these proceedings began. That plan was later amended but proved not to be feasible. A second amended plan was filed June 25, 1996. That plan was voluntarily withdrawn by the Rehabilitator. On June 30, 1998, the Rehabilitator filed the petition for preliminary confirmation of the Plan we consider here.

On filing of the Rehabilitator's petition for preliminary confirmation of the Plan, we entered an order establishing requirements for notifying persons affected and fixing October 23, 1998 as the last date for lodging objections to the Plan as proposed. Objections were filed by the Policyholders' Committee, several individual policyholders, a former agent of Fidelity Mutual, former officers and directors, as well as by unsecured corporate creditors, and by Arthur Andersen, LLP. The Court then entered an order directing discovery and establishing pre-hearing procedures. Notice of hearings on the proposed Plan and objections thereto was effected by mail and by publication in newspapers of general circulation.[3] Hearings were held July 16, 19, August 9 and 10, and September 21, 1999.

At the same time she sought preliminary approval of her Plan, the Rehabilitator proposed paying policyholders $60 million in policyholder dividends. That proposal was challenged by an unsecured creditor of Fidelity Mutual, Tri–Links Investment

---

1. Section 515(c) of Article V of the act of May 17, 1921, P.L. 789, *as amended,* known as the Insurance Company Law of 1921(Law), provides that a rehabilitation order entered by the Commonwealth Court shall appoint the Insurance Commissioner rehabilitator of the insurer. 40 P.S. § 221.15(c). Article V, Sections 501 through 563 of the Law, was added by Section 2 of the Act of December 14, 1977, P.L. 280.

2. Included in this request is the Insurance Commissioner's petition to make subsequent modifications to the Plan and related documents, her separate petition to modify certain provisions of the Plan relating to stock allocation, and her petition to approve the bid procedures, which are integral components of Fidelity Mutual's proposed rehabilitation.

3. The *Wall Street Journal,* the *Philadelphia Inquirer,* the *Harrisburg Patriot–News* and *USA Today.*

Trust, which had also objected to the Plan. In June 2000, the Rehabilitator amended her petition to seek approval to pay dividends in the amount of $70 million in the year 2001, on settlement of Tri–Link's objection to the Plan. Consequently, the Court approved Tri–Link's settlement with the Rehabilitator and granted her amended dividend and dividend access petitions, allowing payment of up to $70 million in dividends in 2001. The Rehabilitator thereafter petitioned for approval to pay $65 million in policyholder dividends for the year 2002. The Court granted that petition in August 2001.

Shortly thereafter, we entered an Order terminating, as of October 1, 2001, the moratorium on policy surrenders, policy loans and withdrawals of accumulated dividends that was imposed when Fidelity Mutual was placed in rehabilitation.[4] Allowed claims of unsecured creditors with interest have begun to be paid as of that date. With certain modifications proposed by the Rehabilitator in order to resolve some of the Policyholders' Committee's objections, the Plan is now before us for review and disposition.[5]

### Plan Overview

Broadly speaking,[6] the Rehabilitator proposes in this Plan that Fidelity Mutu-

al's policy obligations, as well as certain other specified liabilities, will be assumed by an acquired stock life insurance company, known as Fidelity Life Insurance Company (FLIC);[7] that an outside investor will infuse capital into the company by purchasing common shares of stock of FLIC's holding company, Fidelity Insurance Group (Group), in a competitive bidding process; and that all claims against Fidelity Mutual, Group and FLIC, the Commissioner, the Insurance Department, the Rehabilitator, officers, employees and agents of these entities, other than claims provided for in the Plan, will be discharged at closing. An injunction provision proposed in the Plan would prohibit legal actions or any other pursuit of claims that have been discharged.

Accordingly, the Plan provides that the acquired stock life insurance company, FLIC, will in turn acquire virtually all the assets of Fidelity Mutual; and that FLIC will then assume by reinsurance Fidelity Mutual's obligations under its life insurance and other contracts in force on the day of closing. Since FLIC will not be a mutual company, Fidelity Mutual's contracts in force will be modified to delete provisions relating to voting rights and surplus participation. Any cash value contracts in force at closing will be governed

---

4. Section 516(d) of the Law, 40 P.S. § 221.16(d), expressly authorizes such moratoria in cases of the rehabilitation of life insurance companies. Our order was entered on stipulation of the Rehabilitator and the Policyholders' Committee, the sole challenger to the Rehabilitator's proposal to lift the moratorium.

5. Section 516(d) also provides that this Court "may either approve or disapprove the plan ... or may modify it and approve it as modified."

6. The Plan itself is 178 pages, including exhibits. An overview prepared by the Rehabili-

tator and sent to all contractholders, creditors and other persons in interest pursuant to Court-mandated notice of the Plan, is comprised of 78 pages and offers a more detailed view of the Plan than need be accomplished here. The Policyholders' Committee also prepared a notice generally supporting the Plan that was included in the overview.

7. The Court approved the Rehabilitator's petition to purchase FLIC in April, 1995, shortly after the Rehabilitator's first plan for the rehabilitation of Fidelity Mutual was submitted. FLIC has been an integral component of the subsequent proposed plans, including this one.

by certain provisions designed to approximate equivalent values after closing.

General unsecured creditors will receive the allowed principal amounts of their claims plus simple six percent (6%) annual interest. Interest will be paid from the original rehabilitation date or claim accrual onward, through closing, until the principal is paid. The Plan's classification of claims follows the same priority of distribution as that required by the Law when an insurance company is to be liquidated.[8]

At closing, Fidelity Mutual will surrender its shares of Group, the holding company of FLIC. Group will issue shares of preferred and common stock to Fidelity Mutual's mutual members, according to a formula that purports to compensate them for the loss of their voting rights in the old mutual company and takes into account their contributions to surplus. The holders of certain retirement funding products marketed by Fidelity Mutual will receive plan credits rather than stock.

Group will then sell shares of common stock, through a Court-approved competitive bidding process, sufficient to render the buyer of that stock the majority stockowner of Group. As majority stockowner, the investor will have the right to appoint a majority of the boards of directors of both Group and its subsidiary FLIC for a period of two years after closing. The Rehabilitator and the Policyholders' Committee will appoint the remaining members to those boards. Group will contribute the proceeds of its common stock sale to FLIC. FLIC will assume Fidelity Mutual's additional obligations, including those under its policy for indemnification of officers, directors and agents of Mutual Fire. The investor will be required to submit a business plan to the Insurance Commissioner, detailing its plan to operate FLIC as a going concern.

The Plan as proposed includes provisions for the discharge and release of all claims, except those obligations imposed under the Plan, against Fidelity Mutual, Group, FLIC, the Insurance Commissioner and Department, the Rehabilitator or her deputies, and all officers, employees and agents of those entities during the rehabilitation. Section 14.05 of the Plan enjoins legal actions or other pursuit of claims that have been discharged and released.

*Objections to the Proposed Plan*

As mentioned, the Policyholders' Committee filed objections to certain provisions of the Plan, while generally supporting it overall. Certain individual policyholders and unsecured creditors also objected to the Plan. Numerous individuals—as well as all the corporate unsecured creditors—who had objected to the plan withdrew those objections as a result of settlement of their claims against Fidelity Mutual. This Court dismissed the objections of Arthur Andersen, LLP by Memorandum and Order of July 9, 1999, and we dismissed the objections of former officers and directors by Memorandum and Order of November 23, 1999. Thus, we are left to consider the objections of the Policyholders' Committee and those of certain individual objectors. We will weigh the Policyholders' Committee's objections and the Rehabilitator's response to them before turning to the individual objections *seriatim*. We will begin, though, with a discussion of our standard of review, which marks the first, and perhaps most fundamental, point of departure between Rehabilitator and the Policyholders' Committee.

8. *See* Section 544, Article V of the Law, 40 P.S. § 221.44.

### Standard of Review

■ The Policyholders' Committee, recognizing our Supreme Court's enunciation of it in *Foster v. The Mutual Fire, Marine and Inland Insurance Company*, 531 Pa. 598, 614 A.2d 1086 (1992), *cert. denied* 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 356 (1993), and *cert. denied* 506 U.S. 1087, 113 S.Ct. 1066, 122 L.Ed.2d 371 (1993) (*Mutual Fire*), acknowledges that the standard for reviewing a plan of rehabilitation requires that we determine whether the Rehabilitator has abused her discretion "in formulating the [p]lan of [r]ehabilitation." *Id.*, 531 Pa. at 610, 614 A.2d at 1092. Nonetheless, it is the Policyholders' Committee's position that not all matters provided for in this, or for that matter, any rehabilitation plan are subject to such a standard of review. The Committee submits that matters *not* within an administrative agency's expertise in a particular field are not subject to such deference by a reviewing court, but should be looked at more closely. For this proposition, the Committee cites *Drain v. Covenant Life Insurance Company*, 551 Pa. 570, 712 A.2d 273 (1998), a case determining whether the Insurance Commissioner or a judicial tribunal had jurisdiction over a complaint that, for the most part, alleged improprieties on the part of corporate officers in consummating an insurance company merger. The Policyholders' Committee contends that the Court should apply a different standard of review to certain provisions of this Plan to which it has objected. For example, the Committee suggests that the release and injunction provisions proposed in the plan, the assignment and assumption provisions and the preferred stock provisions are the kind of plan components governing corporate action that should be subject to closer scrutiny than that authorized under an abuse of discretion standard. The Committee argues that we have greater review powers over those aspects of the Plan that fall outside the Insurance Commissioner's traditional expertise, and suggests our review is akin to that applied by federal bankruptcy courts in their confirmation of reorganization plans.

Alternatively, the Committee argues that, even if we are to apply the "abuse of discretion" standard, that standard has not been met. Our Courts have found that an abuse of discretion occurs when there is bad faith, fraud, capricious action or abuse of power in the administrative agency or department's action. *McDermond v. Foster*, 127 Pa.Cmwlth. 151, 561 A.2d 70 (1989). It has also been said that an administrative agency abuses its discretion when its "findings of fact are not supported by substantial evidence," *Supervisors of Greene Township v. Kuhl*, 112 Pa. Cmwlth. 624, 536 A.2d 836, 840 (1988). The Committee posits that no substantial evidence supports the Rehabilitator's finding, for example, that the release and injunction provisions are necessary to the successful rehabilitation of Fidelity Mutual.

The Rehabilitator, on the other hand, urges us to adhere to the abuse of discretion standard enunciated in *Mutual Fire* for reviewing rehabilitation plans, and we are convinced that we should do so. First, the Supreme Court has articulated no authority for departing from that standard or making exceptions to it. Without question, the *Mutual Fire* rehabilitation plan that was reviewed and approved under that standard encompassed many decisions that would be considered the kind of "corporate action" the Committee suggests is subject to stricter review. Second, *Drain*, the sole authority on which the Committee relies, decided a *jurisdictional* question—that is, whether the Insurance Commissioner or the court of common pleas sitting in equity had jurisdiction over a complaint.

That decision turned on whether to characterize the complaint against officers and directors of two merging insurance companies as a tort claim or as an administrative challenge to the Insurance Commissioner's merger approval. Instantly, we do not determine a question of jurisdiction. No one disputes the authority of the Rehabilitator to create a plan of rehabilitation, or the jurisdiction of this Court to review that plan. Rather, we review decisions, many of them necessarily about the business of insurance,[9] made in the course of formulating a rehabilitation plan. As we see it, *Drain* provides no authority for departing from the abuse of discretion standard that the Supreme Court has instructed us to employ. That Court has said that the Insurance Commissioner

> must be afforded that freedom of action in the over-all management of the company which will permit [her] to knowledgeably evaluate, plan, devise, and implement a program which *in [her] best judgment and in keeping with [her] expertise in the field of insurance* will accomplish the objective of the [rehabilitation] proceeding.
>
> This Court has concluded that this great deference in favor of the Insurance Commissioner and the resulting narrow scope of review for the courts are in recognition of the expertise of the administrative agency or individual officer assigned the task of regulating a given industry.

*Mutual Fire*, 531 Pa. at 612, 614 A.2d at 1093 (quoting with approval *Kueckelhan v. Federal Old Line Insurance Company*, 74 Wash.2d 304, 444 P.2d 667 (1968)) (emphasis added). With that standard in mind,

we examine the objections of the Policyholders' Committee to specific Plan provisions.

### Objection to the Release Provisions

█ Section 14.03(a) of the Plan provides a discharge of Fidelity Mutual from all liabilities, other than as set forth in the Plan. Section 14.03(b) provides that policyholders, claimants and creditors of Fidelity Mutual are deemed to have released and discharged the Commonwealth, the Insurance Department, the Commissioner, Fidelity Mutual, Group and FLIC, as well as the officers, directors, employees and agents of these entities, and the Policyholders Committee from all claims, obligations, debts, liabilities and actions arising from or associated with the Plan or with the rehabilitation of Fidelity Mutual. Section 14.04 of the Plan sets forth seven exceptions to Section 14.03. Claims excepted from the discharge and release provisions are those for fraud, self-dealing, willful misconduct or recklessness; those arising pre-petition or after closing; those for obligations expressly assumed under the Plan; unresolved claims that are later allowed; third-party claims assigned to FLIC; and employee indemnification claims assumed by FLIC.

The first challenge to these release provisions we must confront is to our jurisdiction to approve them. The Policyholders' Committee contends that the release of claims against nondebtor third parties must be excluded from the Plan for lack of this Court's jurisdiction over such claims. We agree with the Committee's general proposition that our jurisdiction over an

---

**9.** Section 515(c), Article V of the Law, 40 P.S. § 221.15(c) authorizes the Insurance Commissioner, as rehabilitator, to "take possession of the assets of the insurer ... and to administer them under orders of the court." Section 516(b), 40 P.S. § 221.16(b), provides that the Commissioner "shall have all the powers of the directors, officers and managers" of the company and shall have "full power to *direct and manage* ... and to deal with the property and *business* of the insurer."

action cannot be "bootstrapped" simply by virtue of including a provision for it in a rehabilitation plan over which we *do* have jurisdiction. "If proceedings over which the Court has no independent jurisdiction could be metamorphosed into proceedings within the Court's jurisdiction by simply including their release in a proposed plan, this Court would acquire infinite jurisdiction." *In re Digital Impact*, 223 B.R. 1, 11 (Bankr.N.D.Okla.1998). We do not agree with the Committee's contention, however, that the releases contained in this Plan must be excised for lack of jurisdiction.

The Policyholders' Committee readily acknowledges our jurisdiction in the field of insurance company rehabilitations, which jurisdiction is conferred by Section 761(a)(3) of the Judicial Code, 42 Pa.C.S. § 761(a)(3):

> The Commonwealth Court shall have original jurisdiction of all civil actions or proceedings:
>
> . . .
>
> (3) Arising under Article V of the act of May 17, 1921 (P.L. 789, No. 285), known as "The Insurance Department Act of 1921."

The Committee asserts, however, that we do not have jurisdiction to enforce those Plan provisions that purport to release claims by policyholders against nondebtors because such actions are actions by third parties against third parties. Therefore, the Committee argues, they do not "arise under" the Law's provisions for the rehabilitation of Pennsylvania domiciled insurance companies. We cannot accept this argument.

The release provisions in the Plan specify those persons they protect and the circumstances in which they apply. Not all nondebtors are deemed to have been released. The Rehabilitator, Fidelity Mutual, Group, FLIC, and agents of these persons are released; they are released from claims "arising from" or "associated with" the Plan or the rehabilitation of Fidelity Mutual. The provisions would release claims *post closing*—not those prior to closing or prior to the rehabilitation petition—that are asserted against persons who now work or who have worked for the Rehabilitator or Fidelity Mutual, for damages resulting from their conduct as officers, employees or agents during this rehabilitation. We interpret such release provisions to be strictly limited to those classes of persons expressly enumerated and to acts or omissions by those persons in their rehabilitation capacities. Thus, they are claims arising from and directly related to their relationship to the debtor, the Fidelity Mutual estate. Section 516 of the Law, 40 P.S. § 221.16, entitled "Powers and duties of the rehabilitator," expressly provides that a rehabilitator may appoint deputies and direct and manage employees, whose duties shall be delegated by her. Because the released nondebtors specifically enumerated in Section 14.03(b) of the Plan serve under the Rehabilitator's authority and carry out the statutory functions of the rehabilitation at her command, claims against such nondebtors for acts or omissions in rehabilitating a troubled insurance company arise under Article V of the Law. They are civil actions arising under Article V, and jurisdiction is therefore vested in the Commonwealth Court pursuant to Section 761(a)(3) of the Judicial Code. *See Maleski by Taylor v. DP Realty Trust*, 653 A.2d 54 (Pa.Cmwlth. 1994) (actions authorized by Article V "arise under" Article V, and jurisdiction thereof lies in Commonwealth Court).

Our determination that we would have jurisdiction to enforce the release and discharge provisions of the Plan is supported by *Feige v. Sechrest*, 90 F.3d 846 (3rd Cir.1996). There, the United States Court of Appeals for the Third Circuit, in decid-

ing the district court properly granted a stay of a federal action pending state court review pursuant to the *Burford*[10] abstention doctrine, found that a suit by a putative purchaser of a liquidated insurance company against certain nondebtors were "certainly related to" the statutory liquidation of that company, *Feige*, 90 F.3rd at 848, and that Commonwealth Court jurisdiction of that action was "based on the [l]iquidator's case *arising under* the Insurance Act ... [,]" *Feige*, 90 F.3rd at 849 (emphasis added), since if that suit were to have prevailed, it would have "affect[ed] directly and adversely what the [l]iquidator is attempting to achieve through her proceedings...." *Id.*[11]

Conversely, we cannot conclude that the *Drain* decision, discussed above, is of much avail to the Policyholders' Committee in its jurisdictional challenge either. First, that case did not decide the question of Commonwealth Court's Section 761(a)(3) jurisdiction, but held that the common pleas court was wrong not to exercise its jurisdiction under 15 Pa.C.S. § 1793. Second, the "third parties" being sued in *Drain* were not acting as agents or representatives of the Insurance Commissioner or a rehabilitated company.[12] Moreover, as proposed in the Plan here,

claims arising from conduct occurring prior to the rehabilitation petition are not deemed to be released; claims for fraud, self-dealing and willful misconduct are also not deemed to be released. *These types of claims*, specifically excluded from the Plan's release provisions, are more akin to the claims made in *Drain*, "for alleged improprieties in consummating the merger," *Id.*, 551 Pa. at 580, 712 A.2d at 278, that were held to be within the common pleas court's jurisdiction.

Indeed, the claims the Rehabilitator proposes to release here are post-closing claims against the Rehabilitator or her agents and employees or against the officers, directors, agents and representatives of Fidelity Mutual for their conduct *during* the rehabilitation in their official capacities as employees, agents and representatives of the Rehabilitator. Such claims are inexorably bound to the rehabilitation proceedings themselves. We conclude that such claims are within the jurisdiction conferred on us by Section 761(a)(3) as claims arising under Article V of the Law.

Because we decide that we have jurisdiction by virtue of Section 761(a)(3) of the Judicial Code, we need not decide whether we have ancillary jurisdiction, under Section 761(c),[13] to authorize the release and

---

**10.** *Burford v. Sun Oil Company,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

**11.** Claims against nondebtors who assert common law or contractual indemnity from Fidelity Mutual would certainly "directly affect" the estate, as would the potential for claims over made by nondebtors, by virtue of their potential to remove assets from the estate. Contingent liabilities such as these would have to be disclosed to potential bidders.

**12.** Similarly in *Vickodil v. Insurance Department,* 126 Pa.Cmwlth. 390, 559 A.2d 1010 (1989), a suit brought against, *inter alia,* the liquidator of an insolvent insurance company, we transferred an action against a reinsurer

of that company, who was "not acting in any capacity as a Commonwealth agency or official," to common pleas court. 559 A.2d at 1014.

**13.** Section 761(c) of the Judicial Code, 42 Pa.C.S. § 761(c), confers ancillary original jurisdiction on Commonwealth Court over "any claim or other matter which is *related to* a claim or other matter otherwise within its *exclusive* original jurisdiction." To the extent that our ancillary jurisdiction over claims "related to" Article V claims is analogous to the "related to" jurisdiction given to federal bankruptcy courts pursuant to the Bankruptcy Code, *Pacor v. Higgins,* 743 F.2d 984 (3rd Cir.1984), gives guidance as to where such jurisdiction extends. "The usual articulation

discharge of those same claims pursuant to a rehabilitation plan we may approve. However, we discuss those cases the Policyholders' Committee commends to us, for the most part [14] federal bankruptcy cases, in support of its proposition that no ancillary jurisdiction exists because the Committee asserts that their "relevance to this case is manifest."

In *Callaway v. Benton*, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949), a case deciding a railroad reorganization under the former provisions of the Bankruptcy Code, the United States Supreme Court held that the district (bankruptcy) court did not have the authority to enjoin a state court action brought by dissenting shareholders of the railroad's lessor to prevent the sale of the lessor's assets to the railroad. The railroad reorganization plan called for the lessor either to sell its assets to the debtor railroad on specific terms or to allow its lease to be repudiated and seek damages from the railroad. There, the Supreme Court found that, in the state court action improperly enjoined, "the question involve[d] not the debtor's leasehold, but the reversion in fee held by [the] lessor." Persons *unrelated* to the debtor sued the lessor, which "was not in reorganization in the [debtor's] proceedings, nor could it have been reorganized in the [debtor's] proceedings. The controversy . . . requires a determination of the rights of the [nondebtor's] stockholders *inter se* . . . We think that the interest here involved is not part of the property of the debtor, and that district court's assertion of exclusive jurisdiction was error." 336 U.S. at 143, 69 S.Ct. 435.[15] Ultimately, the Court said, "[w]e conceive the jurisdiction asserted by the district court over a solvent lessor not in reorganization to be an extension of [the court's] traditional powers not justified by any provisions of the Bankruptcy Act." *Id.*, 336 U.S. at 148, 69 S.Ct. 435. Of course, since *Callaway,* . a great many of those provisions have changed. Although 28 U.S.C. § 2283 still provides that a federal court may not grant an injunction or stay of a state court proceeding except as expressly authorized

---

of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."* 743 F.2d at 994 (emphasis added). Certainly, it is possible to conceive of a proceeding against an indemnified nondebtor, for example, that would have some effect on Fidelity Mutual's estate.

**14.** The other cases the Committee cites for the proposition that ancillary our jurisdiction does not extend to third party action that are neither by or against a Commonwealth party, *Youst v. Department of Transportation,* 739 A.2d 625 (Pa.Cmwlth.1999); *Department of Environmental Protection v. Altoona City Authority,* 689 A.2d 1009 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 548 Pa. 35, 693 A.2d 583 (1997); *Reider v, Bureau of Correction,* 93 Pa.Cmwlth. 326, 502 A.2d 272 (1985), and *Department of Transportation v. Joseph Bucheit & Sons Co.,* 506 Pa. 1, 483 A.2d 848 (1984), all answered questions of our jurisdiction our ancillary to 761(a)(1) and (a)(2) jurisdiction, which, in contrast to 761(a)(3) "Article V" jurisdiction, is predicated on the nature of the parties' identity, rather than on the nature of the claims. Moreover, in *Altoona City Authority* and *Bucheit,* our 761(a)(2) *concurrent* jurisdiction was implicated; no ancillary jurisdiction could therefore have been found to exist in any event since Section 761(c) confers ancillary jurisdiction on Commonwealth Court only over matters related to our *exclusive* jurisdiction. It is readily apparent that none of the cases cited is determinative of the question of jurisdiction ancillary to our Article V exclusive original jurisdiction.

**15.** By contrast, the Committee's standing to object to the Plan is based on the interest of the policyholders it protects. Thus, unlike the state court plaintiffs in *Callaway,* who were not creditors of the bankrupt railroad, the Committee is comprised of a class of creditor/owners of Fidelity Mutual.

by Act of Congress, or where necessary in aid of its jurisdiction or to protect its judgment, 28 U.S.C. § 1334(b) now extends the bankruptcy jurisdiction to matters "*arising under, arising in or related to*" reorganization of bankrupt estates.

■ Subject matter jurisdiction and authority to act are separate elements of a court's capacity, and as to that authority, our discussion of *Callaway* presents an opportunity to discuss the extent to which matters decided under the current federal Bankruptcy Code are analogous to those decided in these state court rehabilitation proceedings. Section 761(a)(3) of the Judicial Code, granting jurisdiction to Commonwealth Court to hear matters "arising in" or "related to" insurance company rehabilitations, uses language similar to 28 U.S.C. § 1334(b). In contrast, there is nothing in Article V of the Insurance Law that resembles Section 524(e) of the Bankruptcy Code, 11 U.S.C. § 524(e), which states that the "discharge of a debt of the debtor does not affect the liability of any other entity on or the property of and other entity for, such debt." No such prohibition or limiting provision can be found in Article V. There is simply no perfect statutory parallel between federal bankruptcy reorganizations and insurance company rehabilitations that might lead us to conclude that release provisions in both contexts must be similarly treated. Instead, we must look to Article V, Section 505(a) of the Law to see what authority, if any, exists. Section 505(a) provides:

(a) Any receiver appointed in a proceeding under this article may at any time apply for and the Commonwealth Court may grant, such restraining orders, preliminary and permanent injunctions, and other orders as may be *neces-*

*sary and proper* to prevent: (i) the transaction of further business; ... (iii) *interference with the receiver or with the proceeding*; (iv) *waste of* the insurer's *assets;* ... (vi) *the institution or further prosecution of any actions or proceedings;* ... (xi) *any other threatened or contemplated action that might lessen the value of the insurer's assets or prejudice the rights of policyholders, creditors, or shareholders, or the administration of the proceeding.*

40 P.S. § 221.5(a) (emphasis added). Thus, it is clear that we may enter injunctive orders in rehabilitation proceedings if they are "necessary and proper," and if they prohibit, *inter alia*, actions that would interfere with the company's rehabilitation, waste its assets, lessen the company's value or cause prejudice to policyholders and creditors rights. The Policyholders' Committee contends that the inclusion of the proposed release provisions in the Plan is neither necessary nor proper.

Again, the Policyholders Committee commends us to cases in bankruptcy jurisprudence, and rightly so, because there is little precedent in state rehabilitation proceedings. Despite the already noted statutory differences between the Bankruptcy Code and Article V, we would be unwise not to look to bankruptcy cases for guidance because, for example, *In re Continental Airlines*, 203 F.3d 203 (3d Cir.2000), and *In re Digital Impact* discuss the interplay between the prohibitory language of Section 524(e) of the Bankruptcy Code and the permissive language of its Section 105, 11 U.S.C. § 105, which is not unlike Article V's grant of authority to issue injunctive relief where "necessary and proper." [16]

---

**16.** Section 105(a) of the Bankruptcy Code supplements a court's specifically enumerated powers by authorizing orders "necessary or appropriate" to carry out the purposes of the Bankruptcy Code.

In *Continental Airlines,* the Third Circuit Court addressed the issue of the validity of releases of third party claims against nondebtors, reviewing the decisions of several other circuits, some of which have imposed a blanket rule forbidding them, and some of which have "adopted a more flexible approach," 203 F.3d at 212, and found them permissible in certain limited circumstances. We will not attempt to reiterate the Honorable Marjorie O. Rendell's thoroughgoing and insightful discussion of those cases or its sound reasoning in striking down the releases contained in the reorganization there. We simply point out again the absence of any provision in Article V resembling Section 524(e)'s prohibition, which governed in that case, and emphasize the differences between the release provisions examined in *Continental Airlines* and those the Rehabilitator proposes here. Unlike the *Continental Airlines* release provisions, those in Fidelity Mutual's Plan do not include claims for pre-petition acts or omissions; they do not include claims for fraud or other intentional or acts; they do not release Fidelity Mutual's claims against directors, officers or employees or agents; and, as the Rehabilitator points out in her brief, they do not *extinguish* claims for acts or omissions during the rehabilitation, but merely set a deadline for such claims. For similar reasons, we also find the *Digital Impact* case, on which the Policyholders' Committee relies, distinguishable. There, the release provision of the reorganization plan provided that "all [c]laims ... whether known or unknown ... vested or contingent or otherwise which any person ... had or may have had against [the nondebtor] which arose or existed prior to Confirmation in any regard respecting or relating to Digital (whether pre-Petition or as Debtor)

... shall be fully released and discharged." 223 B.R. at 4.

The release provisions in this Plan do not go as far as those in *Continental Airlines, Digital Impact* and *Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159 (7th Cir. 1994), which the Policyholders' Committee also cites. At closing, and not before, the Plan's release provisions bar claims against the Rehabilitator, her employees, agents and representatives for negligent acts or omissions made at the Rehabilitator's direction *during* the rehabilitation. They do not bar claims arising prior to the rehabilitation or prior to closing; they do not bar future claims. They do not bar claims against the investor or potential investors.[17] The provisions provide a measure of certainty to potential investors and thus contribute to the attractiveness of the investment. They eliminate one factor, real or perceived, investors would cite to reduce offers. They also reduce, if not eliminate, potential lawsuits that would be an administrative and financial drag on the rehabilitation proceedings here. We do not accept the Committee's contention that the proposed release provisions are not necessary.

█ Nor do we find the release and injunction provisions improper because they present a conflict of interest, as the Committee suggests. Simply because the provisions protect the persons who authorized or advocated their inclusion while at the same time protecting the estate is not a reason to find that they present a conflict. In this sense, the provisions are not unlike the indemnification provisions that were approved in *Mutual Fire,* where the Supreme Court stated that there are "valid policy concerns" to support the inclusion

---

17. In this way, the release and injunction provisions considered here are materially different than those in *Zerand–Bernal Group.*

of such provisions. 531 Pa. at 635, 614 A.2d at 1105. Moreover, and in the event, the release and injunction provisions protect the estate, as well as the Rehabilitator and her agents "in the course of all [their] actions within the scope of their appointed duties" from "the fears and costs of possible litigation by naturally disgruntled claimants and other creditors who will inevitably suffer some loss." *Id.*[18] Thus we find that the discharge and release provisions meet Article V's requirement that any injunctive relief we may grant be "necessary and proper."

Having decided that no jurisdictional hurdle or statutory circumscription of authority impedes our ability to approve a plan of rehabilitation containing the release provisions found here, we turn to the Policyholders' Committee's remaining objections to those provisions.

An additional basis on which the Policyholders' Committee objects to these release provisions is that they are against public policy. The Committee cites *Mutual Fire* in support of its proposition. However, there our Supreme Court approved a rehabilitation plan containing an injunction provision very similar in effect to the provisions at issue here, prohibiting suits against Mutual Fire, its rehabilitator or any employee, agent or representative of that rehabilitator. Contrary to the Committee's assertion, neither this Court nor the Supreme Court in *Mutual Fire* decided the question of whether release provisions are against public policy. Our Supreme Court in *Mutual Fire* went no further than to approve of this Court's determination that the plan's *indemnifica-*

*tion* provisions did not receive the same treatment in the law as did *exculpatory* provisions, which *may* be voided as against public policy. *Mutual Fire,* 531 Pa. at 635, 614 A.2d at 1105.

The release provisions at issue here are designed to insulate FLIC from newly asserted negligence claims based on acts or omissions by the Rehabilitator, her agents, and by Fidelity Mutual officers, employees and agents during the rehabilitation. Such claims would be subject to indemnification actions against FLIC. The release provisions do not bar causes of action asserted prior to closing, as long as they are timely filed, or those based on intentional wrongdoing. They do not purport to extinguish claims for actions or omissions that arise after closing. They are subject to other exceptions, as enumerated above. We are not persuaded that public policy prohibits their inclusion in this Plan.

We conclude that the release and discharge provisions to which the Policyholders' Committee objects are within this Court's power to approve, are necessary and proper to effectuate the purposes of this rehabilitation, and are not against public policy. Having so concluded, we hold that the Rehabilitator does not abuse the discretion given her when providing for them in her proposed Plan, since she is charged by Section 505(a) of the Law to apply for "such restraining orders [and] ... injunctions as may be necessary to carry out a rehabilitation plan." 42 Pa. C.S. § 221.5(a). We therefore overrule this objection of the Policyholders' Committee.[19]

---

**18.** Additionally, insofar as inclusion of the provisions conflicts with the interests of policyholders, creditors and other persons in interest, it has been disclosed by virtue of the notice this Court required when the Plan was submitted.

**19.** Accordingly, we will overrule the Policyholders' Committee's objection to the Plan's definition of the term "claim," which the Committee asks us to modify in accordance with its objection to these provisions.

*Objection to the Third–Party
Assignment Provision*

■ Section 7.04 of the Plan provides:

**Assignment of Third Party Claims.**
*Every* Person who was a *Contractholder,*
Claimant or Creditor of [Fidelity Mutu-
al] on or after the Rehabilitation Date
*shall,* effective as of the Closing Date, *be
deemed to assign to FLIC,* and shall be
enjoined from pursuing, *any and all
common* or derivative *Third Party
Claims,* which will be pursued exclusive-
ly by the Rehabilitator or by FLIC as
the assignee of such claim.

Third party claims are, in turn, defined in
the Plan as "any claim of a person who
was a Contractholder, Claimant or Credi-
tor of FML on or after the Rehabilitation
Date against any officer, director, agent or
independent contractor of [Fidelity Mutu-
al] ... based on acts or omissions before
the Rehabilitation Date." It is apparent
that this provision operates to assign
claims, such as pre-petition claims and
those for intentional conduct, that are not
deemed released under Section 14.03 of
the Plan.

The Policyholders' Committee objects to
this Plan provision as it relates to *common*
claims of Fidelity Mutual contractholders.
(It does not object to the assignment of
*derivative* claims). The Committee con-
tends that this assignment provision has
the same effect and suffers the same infir-
mities of jurisdiction and public policy as
the release and injunction provisions.

At the outset, we interpret the two Plan
provisions cited above as assigning com-
mon and derivative contractholder and
creditor claims *only.* We interpret them
as *not* assigning third party claims that
are personal and distinct from claims Fi-
delity Mutual has. We also hasten to add
that we are operating in something of a
vacuum, since the testimony at the hearing
revealed that no third party claims have

been brought by policyholders, and we are
otherwise aware of none. That said, we
are faced with determining what future
claims which *might* arise would be deemed
assigned to FLIC under the Rehabili-
tator's proposal, and whether the Rehabili-
tator has the power to make such assign-
ments.

■ In this jurisdiction, our Court has
said that Article V authorizes the rehabili-
tator to pursue actions on behalf of the
insurer and on behalf of the policyholders
and other creditors. *Foster v. Peat Mar-
wick Main & Company,* 138 Pa.Cmwlth.
147, 587 A.2d 382 (1991) (*Foster*). In that
case, we overruled the defendants' prelimi-
nary objections that were grounded on the
purported failure of the plaintiff, the In-
surance Commissioner as rehabilitator of
The Mutual Fire, Marine and Inland In-
surance Company, to state a cause of ac-
tion for injuries to policyholders. The de-
fendant there contended that Article V
authorized her to bring actions "on behalf
of the *insurer*" only. We noted that there,
as here, the company was a mutual compa-
ny and that therefore the policyholders
were both the insureds and the insurers.
We also cited Article V's stated purposes,
among which is the protection of insureds
and other persons, *as well as* the estate,
and found that "a rehabilitator ... may
assert injury common to shareholders and
general creditors and enjoys the authority
to recover estate assets to which they will
eventually look for recovery." 587 A.2d at
385. Such a holding comports with the
stated purpose of Article V to protect the
interest of insureds "through ... equitable
apportionment of any unavoidable loss"
Section 501(c)(iv), 40 P.S. § 221.1(c)(iv).
That purpose is best served in insurance
company rehabilitations, just as it is in the
bankruptcy context, by the rehabilitator's
action on behalf of policyholders, where
the large numbers of identical policies is-

sued render a single forum necessary to dispose equitably of a company's limited assets. Thus, if the Rehabilitator is authorized to bring such claims on behalf of the company *and* the insureds and other creditors, she is authorized to assign those claims.

On the other hand, in *University of Maryland v. Peat Marwick Main & Company*, 923 F.2d 265, 273 (3d Cir.1991), a case related to the same rehabilitation proceedings and involving the same defendant as *Foster*, wherein certain policyholders commenced a class action on behalf of over 20,000 insureds, the Third Circuit Court stated, "the [class action] plaintiffs' claims are brought against PMM for the alleged breach of duties owed by PMM *directly* to the plaintiffs, not to Mutual Fire."[20] There, the Third Circuit reversed the district court's dismissal of the class action based on *Burford* abstention grounds, citing the principle that federal abstention in favor of a state forum where federal jurisdiction also exists is the "exception, and not the rule." 923 F.2d at 272. That case has been consistently followed in the Third Circuit and in other jurisdictions. For example, in *Riley v. Simmons*, 45 F.3d 764 (3d Cir.1995), a case arising out of the New Jersey receivership of the Mutual Benefit Life Insurance Company, the Third Circuit again held that *Burford* abstention was inappropriate, because timely and adequate state court review (in New Jersey receivership proceedings) was not, as the district court found, available in the case of the plaintiffs' federal securities law claims and state fraud claims:

We have held that *Burford* abstention is inappropriate where a plaintiff asserts "claims which are broader than, and *different from,* the Commissioner's ..." We have also acknowledged that *individual* stockholders may have a distinct and independent cause of action from that of the corporation or other stockholders premised on misrepresentations by officers and directors of a corporation.... [Plaintiffs'] claim is for losses they directly suffered, not as stockholders derivatively injured by the directors' or officers' failure to meet their fiduciary duties to the corporation.

45 F.3d at 774 (citations omitted) (emphasis added). *See also Hayes v. Gross*, 982 F.2d 104 (3d Cir.1992) (dismissal not warranted in suit by stock purchaser of failed savings and loan association to recover for federal securities law violations; RTC receiver not entitled to bring action that was direct, not derivative); *but see In re Sunrise Securities Litigation*, 916 F.2d 874 (3d Cir.1990) (federal RICO complaint by depositors of an insolvent savings and loan association stated in substance a claim of injury to the association itself, from which plaintiffs' losses flowed, and was therefore derivative).

This line of cases has generally not been followed by state courts in other jurisdictions. Those courts have held that, in a rehabilitation proceeding, claims common to all policyholders must be maintained by the rehabilitator in her rehabilitation capacity for their collective benefit. In *Insurance Commissioner of Michigan v. Arcilio*, 221 Mich.App. 54, 561 N.W.2d 412 (1997), for example, the Court of Appeals

---

**20.** The Third Circuit noted the differences between the elements and measure of damages in the plaintiffs' class action suit against Peat Marwick and the Insurance Commissioner's action against it: damages for premiums paid for worthless policies; for losses paid and exposure to future losses because they had no insurance policies; for consequential damages due to loss of businesses, all of which, according to the Court, would not be recoverable by the policyholders in their capacity creditors of a rehabilitated estate. 923 F.2d at 274.

of Michigan upheld an order enjoining certain class action fraud and misrepresentation suits against the officers and directors, and the independent auditor of, a Michigan domiciled insurer in rehabilitation. Citing the Michigan rehabilitation statute [21] nearly identical to ours, the court found ample authority to support its conclusion that certain causes of action belong to the rehabilitator alone. "The general assets of the insurer clearly includes causes of action based in tort against a third party whose breach of the appropriate standard of care is alleged to have defrauded the insurer and its policyholders." 561 N.W.2d at 418. "[T]he tort claim itself (i.e., a chose in action) ... is an asset of the rehabilitation *res.*" *Id.* The court distinguished those actions for injuries "*over and above* or *not common to* those injuries suffered by all policyholders," *Id.* at 419 (emphasis in original), which were not subject to the court's prohibition. Significantly, the court noted also that the injunction order in question contained an express exception for individual claims "personal to such persons or entities alone and which cannot be pursued by the Rehabilitator." *Id.* at 420. Moreover, the court was in fact compelled to dissolve the injunction insofar as it proscribed actions for federal securities law violations.

Likewise, in *Liquidation of American Mutual Liability Insurance Company,* 417 Mass. 724, 632 N.E.2d 1209, 1215 (1994), the court recognized a distinction between "common claims, which a receiver has exclusive authority to settle on behalf of policyholders and creditors, and personal claims." The court held that the Massachusetts receiver had the exclusive authority to bring and therefore to settle claims against the independent auditor of the insurance company on behalf of policyholders and creditors. *Id.*

State courts in rehabilitation proceedings have acknowledged that certain claims resulting from insurance company failures are distinct, separate and several from actions that a rehabilitator may bring. At the same time, federal courts have recognized that, while some actions do not belong to the rehabilitator, separate actions in different forums may precipitate a "race to the courthouse." *See, e.g., Riley v. Simmons* (allowing federal class actions may put plaintiffs in position superior to other policyholders and interfere with the rehabilitation process of marshalling assets and equitably distributing them); *see also Sunrise Securities* (important policy considerations implicated where continuation of class action suit could disrupt efforts of FDIC to recover financial institution's assets).

For the purposes of these proceedings, we reconcile the case law in this way. A rehabilitator of a financially troubled or insolvent insurance company is expressly authorized by statute to bring claims on behalf of policyholders as well as the company itself. Federal jurisdiction, however, will not be declined where there is an independent basis for that jurisdiction and mere interference with a receiver's ability to collect estate assets is asserted. A determination of whether a cause of action is for harm directly suffered by the plaintiff and separate and distinct from that suffered by the company or policyholders as a whole can be made only by examining the complaint.

We find that it is not beyond the Rehabilitator's authority or so unreasonable as to be an abuse of her discretion to include in this Plan the assignment provision she proposes. We will therefore approve its

---

**21.** Michigan's IRLA Section 8114(3) and 40 P.S. § 221.16(c) contain identical language.

inclusion. No third party claim currently exists, so we leave for another day, when and if a claim is brought, the question of whether a particular claim is assignable. We will overrule the Policyholders' Committee's objection to Section 7.04 of the Plan.

### Objection to the Indemnification Provisions

■ Section 8.02(d) of the Plan provides that FLIC will assume all liability, including that not paid for or reimbursed by applicable liability insurance coverage, under Fidelity Mutual's indemnification program, which program was put into effect by the Deputy Rehabilitator on February 14, 1994. Section 8.02(d) requires FLIC at closing to assume Fidelity Mutual's indemnification obligations above and beyond the limits of the $15 million Directors & Officers (D & O) liability policy the Rehabilitator purchased. This Court approved the purchase of that policy on September 10, 1998.

The Policyholders' Committee contends that FLIC's assumption of Fidelity Mutual's indemnification obligations should be limited to $15 million, the amount of insurance the Rehabilitator purchased to fund the indemnification program. The Committee argues that the creation of unlimited indemnification liability, as it presently stands if this Plan provision is approved, will reduce the bidding price. It also asserts that it is inequitable to extend unlimited indemnity to those directors, officers and employees who contributed to Fidelity Mutual's financial downfall.

The Rehabilitator counters that it is not an abuse of her discretion to provide that FLIC assume unlimited indemnification obligation under Fidelity Mutual's program. Although she concedes that the obligation is "open ended," she asserts it will be mitigated by the Plan's release and discharge provisions, which will effectively bar negligence claims against indemnified persons after closing based on acts or omissions during the rehabilitation.

We have no problem approving the inclusion of a provision for indemnification of officers, directors and agents. Indemnification is a reasonable business practice, and such agreements have been approved in this very context. *Mutual Fire*, 531 Pa. at 635, 614 A.2d at 1105. However, we think the Rehabilitator's position here is inconsistent with her position on the necessity for the Plan's release and discharge provisions, and inconsistent with the position she took in advocating the purchase of the $15 million indemnification policy.

One stated purpose of the release provisions is to eliminate uncertainty in value and provide a "fresh start" for the new insurance company. In pressing for those release provisions, the Rehabilitator notes her agreement with the Policyholders' Committee "that significant future claims are unlikely," but asserts that "they are still possible without the 'cutoff.' " As long as they are still possible, the Rehabilitator contends, "investors will have reason to reduce the size of their offers. Further, the reductions would likely be disproportionately large compared to the actual risk, because the reductions would be based on a worst case scenario." (Rehabilitator's Reply Brief in Support of Preliminary Confirmation, pp. 26–27). We do not see how this reasoning would not apply with equal force to the "open-ended" indemnification program the Rehabilitator proposes. Even with the reduction in the likelihood and size of claims the release and discharge provisions will effect, the Rehabilitator as much as concedes that uncertainty remains a factor of the unlimited indemnification that is to be transferred to FLIC. She submits that transferring Fidelity Mutual's indemnification obligation will elimi-

nate the need to set aside a special fund for such a purpose, the size of which fund "would almost certainly be too little or too much," (Reply Brief, p. 47).

Regardless of whether a set-aside is created for them, the moneys to fund the indemnity obligation are to the same extent encumbered. Transferring Fidelity Mutual's unlimited indemnity to FLIC does not cure the defect. Either assets sufficient to cover any possible indemnification contingency would have to be left with Fidelity Mutual, as the Rehabilitator's testimony at the hearings suggested, thereby reducing the assets available to the new company, or the new company's value would be reduced to the same extent by that indemnification contingency. Potential investors would have reason to reduce their offers in either event. If maximization and certainty of value is to be promoted by the Plan's release provisions, then that purpose is undermined by unlimited indemnity.[22]

The Rehabilitator's position on this Plan provision is also inconsistent with the position she took when petitioning the Court for approval of the purchase of D & O liability insurance. It was in the exercise of her discretion, with "all the powers of the directors, officers, and managers" of the insurer, that the Rehabilitator sought approval in 1998 to purchase a liability policy with a $15 million limit per claim and in the aggregate. She has not asked for approval to purchase more coverage; nor has she offered evidence of change in circumstances since then that would warrant more coverage.

For these reasons, we cannot agree with the Rehabilitator that it is a proper exercise of her discretion to propose the transfer of unlimited indemnification obligations from Fidelity Mutual to FLIC. We will direct her to modify Section 8.02 the Plan accordingly.[23]

### Objection to FLIC's Limited Assumption of Policyholders Adverse Tax Consequences

Section 8.02(h) of the Plan provides that FLIC will assume liability for adverse tax consequences to policyholders due to any loss of grandfathered tax status under the Internal Revenue Code as a result of (1) payments or credits pursuant to the Court approved policyholder dividends that have made; and (2) contract modification by endorsement under the terms of the Plan. The Rehabilitator has received favorable private letter rulings from the IRS with regard to certain portions of the Plan that implicate policyholders' federal liability. The Committee suggests that the Plan should include a provision that FLIC assume *all* liability for adverse tax consequences that policyholders may suffer, without limitation.

We agree, however, with the Rehabilitator that it is not an abuse of her discretion to provide for the express limitations set forth in Section 8.02(h).[24] As the Rehabilitator points out, the Committee has identified no additional tax consequences, and the Committee had a significant hand in consulting with the Rehabilitator on formulation of the Plan. As the Rehabilitator also points out, since the lifting of the

---

**22.** We also think its inconsistent to argue that the release provisions will significantly mitigate the estate's indemnification obligation while at the same time arguing that unlimited indemnification is necessary.

**23.** We will also direct the Rehabilitator to modify Section 4.5 of the Form of Investment

Agreement to conform to this Plan modification.

**24.** Further, it is consistent with the goal of reducing contingencies, thereby maximizing the attractiveness of the investment.

moratorium on policy surrenders, policy-holders have been free to take whatever actions they choose on their policies, pre-sumably on adequate financial advice and with advance thought to tax implications. We will overrule this objection.

### Objection to Section 5 of the Terms of Series A Convertible Preferred Stock of FLIC

■■■ Attachment "C" of the Plan is the document setting forth the terms of the preferred stock policyholders will receive under the Plan. Section 5(b) outlines the remedy in the event dividends payable on the preferred stock are unpaid in an amount equivalent to four quarterly divi-dends.[25] In that event, preferred stock-holders may expand the nine-member Group board of directors by two members. According to the testimony, the preferred stock of Group will represent as much as seventy-five percent of the total equity capitalization of the company. Other testi-mony indicated that preferred sharehold-ers would represent *at least* fifty percent of the company, while the board of di-rectors would be controlled by the inves-tor, owning only twenty-five percent. The Policyholders' Committee contends that, given the unusually large equity capitaliza-tion component proposed, the Plan does not now provide an adequate remedy to preferred stockholders in the event of missed dividends. The Committee offered its expert to testify that a meaningful de-fault remedy, in contrast to current pro-posal, which it contends is no real remedy

at all, would be to provide that a majority of the board of directors would be chosen by the majority preferred stockholders in the event of dividend default. The Com-mittee also advocates a reduction from four to two missed quarterly dividends to trigger this remedy.

We return to our standard of review in these proceedings, which requires that we afford the Rehabilitator the freedom of action in the overall management of the company, and to Section 516(b) of the Law, which is an express grant of power to the Rehabilitator to exercise all the powers of the directors, officers and managers of the company and to deal with the business of the insurer. Although it appears we have an unusual equity capitalization ratio here (no one disputes this fact), there is ample evidence, in both the Rehabilitator's testi-mony and that of the Committee's own expert, from which we can find that the Rehabilitator has not abused her discre-tion. We are mindful that under the artic-ulated standard of review, we do not sub-stitute our judgment or the Committee's for the Rehabilitator's judgment about this decision. *Mutual Fire.* We overrule the Committee's objection to this Plan compo-nent.

Having disposed of all the Policyholders' Committee's objections, we will turn to the remaining objections of individual policy-holders. We will enter a separate order on the Bid Procedures, which is an integral component of the Plan, and on the reten-tion of an investment banker, which are

---

**25.** Section 5(b) states: [w]henever and as of-ten as dividends payable on any share or shares of the Preferred Stock of the Corpora-tion at the time outstanding shall be accumu-lated and unpaid in an amount equivalent to or exceeding four (4) quarterly dividends (whether or not declared and whether or not consecutive), the number of directors consti-tuting the full Board of Directors shall be increased by two (2) in the manner prescribed

by law and the Articles of Incorporation and By-laws of the Corporation and the holders of record of the Preferred Stock of all series shall thereafter have the right, voting noncu-mulatively and separately as a single class, to elect two (2) directors to the Board of Di-rectors. In any election of directors, the hold-ers of shares of Series A Convertible Preferred Stock shall be entitled to case one (1) vote per share.

the subjects of separate petitions and objections submitted to the Court.

*Individual Objections*

### 1. *Curtis Clark*

 Clark's first objection is that Fidelity Mutual should not be rehabilitated because policyholders would be better off if the company were liquidated. We will overrule this objection. The decision to rehabilitate the business of an insurer is within the sound discretion of the rehabilitator and should not be rejected by the reviewing court unless the rehabilitator has abused that discretion. *Mutual Fire,* 531 at 611, 614 A.2d at 1092. Creditors and policyholders must fare at least as well under a rehabilitation plan as they would under a liquidation. *Id.* 531 at 613, 614 A.2d at 1093–1094 (citing *Neblett v. Carpenter,* 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938)). Testimony indicates that Fidelity Mutual had large deficits in 1992 and 1993, when the decision to place it in rehabilitation was made. If the company were liquidated at that time, existing policies, if purchased by another company, would most likely not pay dividends or excess interest due to these deficits. Fidelity Mutual now has a sizable surplus, as the public financial reports to this Court indicate. The cost of the rehabilitation is also disclosed. The estate has paid and declared significant dividends and crediting rates in the past years. Common and preferred stock distributed to mutual members will have substantial value. The moratorium on policy surrenders has been lifted. There is no evidence indicating that policyholders have not fared at least as well as they would have in liquidation.

### 2. *John Clarke*

In his objection to the Plan, Clarke seeks an amendment to it to ensure that his claims and counterclaims against Fidelity Mutual are adequately treated. The plan provides that unresolved claims that become allowed claims will be paid by FLIC. The Plan's definition of "claim" is sufficiently broad to include counterclaims. A procedure for ultimate court determination of unresolved claims has been in place since 1998. We will therefore overrule this objection.

### 3. *James Corman*

James Corman objected to the Plan on the ground that it did not provide for immediate liquidation if cash surrender values could not be paid. This objection is dismissed as moot, because of the termination of the moratorium on policy surrenders as of October 1, 2001.

 Corman also objected to proceeding with the Plan because, he contends, the independent audit report accompanying the notice of the Plan indicated that certain "policies are not sound." The Ernst & Young Audit Report states that Fidelity Mutual's financial position is fairly represented according to statutory accounting practices, as opposed to the more typical and commonly recognized Generally Accepted Accounting Principles (GAAP). The Rehabilitator offered expert testimony to the effect that statutory accounting practices are accepted as the standard in the industry and by the Insurance Department when an audit opinion is given. That such an opinion includes a disclaimer that it was not performed according to GAAP does not render the opinion unsound. Nor is there any testimony to indicate that Fidelity Mutual's insurance policies are unsound. The financial reports for the last several years have indicated more than sufficient reserves as well as assets to back them.

Next, Corman objects on the ground that the Plan should not proceed because Fidelity Mutual is unable to do business in

his home state and other states. While in rehabilitation, Fidelity Mutual has continued to service policies, pay death benefits, pay dividends, and collect premiums. The Plan requires that the investor provide a business plan to the Insurance Commissioner before acceptance of the investor's offer. It also provides that FLIC obtain all necessary regulatory approvals to do business in the respective states.

We will overrule these objections.

### 4. *Wallace Peacock*

Peacock also objects to the Plan on the ground that it did not include the lifting of the moratorium on policy surrenders. This objection is dismissed as moot.

Peacock also objects to the Plan because he interprets it to provide that company executives will receive the more valuable preferred stock in Group, and that policyholders in contrast will be forced to accept "worthless" common stock proportional to cash surrender values. Nowhere does the plan provide that executives of the company will receive any stock at all. Nor is there any evidence to contradict the Rehabilitator's assertion of the value of the common stock to be distributed. This assertion is supported by the Rehabilitator's own documentary evidence and testimony and corroborated by that of the Policyholders' Committee. These objections will be overruled.

### 5. *Floyd Dare and Frank Falbey*

Dare and Falbey timely objected to the Plan but failed to state any grounds for their objections or offer memoranda in support of them. Therefore, Dare and Falbey are deemed to have waived these objections, and they will be accordingly dismissed.

### *Conclusion*

We have thus disposed of all outstanding objections to the Rehabilitator's proposed Third Amended Plan of Rehabilitation. We will enter an appropriate Order.

### ORDER

AND NOW, this 22nd day of May 2002, on consideration of the Rehabilitator's Petition for Approval of the Third Amended Plan of Rehabilitation (Plan) and the outstanding objections thereto, it is hereby ORDERED that:

1. the objections of the Policyholders' Committee to Section 14.03(b) of the Plan are overruled;

2. the objection of the Policyholders' Committee to the definition of the term "claim" contained in Article I, Definitions, of the Plan is overruled;

3. the objections of the Policyholders' Committee to 7.04 of the Plan are overruled;

4. the objections of the Policyholders' Committee to Section 8.02(d) of the Plan and to Section 4.5 of the Form of Investment Agreement are sustained, and the Rehabilitator shall modify the Plan in accordance with the opinion accompanying this Order;

5. the objection of the Policyholders' Committee to Section 8.02(h) of the Plan is overruled;

6. the objection of the Policyholders' Committee to Section 5(b) of the document entitled "Terms of Series A Convertible Preferred Stock of Fidelity Insurance Group, Inc." is overruled;

7. the objection of Curtis Clark is overruled;

8. the objection of John Clarke is overruled;

9. the objection of James Corman as to the absence of a liquidation provision is dismissed as moot, and his remaining objections are overruled;

10. the objection of Wallace Peacock as to the absence of a provision lifting the moratorium on policy surrenders is dismissed as moot, and his remaining objection is overruled

11. the objections of Floyd Dare and Frank Falbey are dismissed; and

12. the Rehabilitator shall make the modifications set forth in her February 5, 2001 petition to modify the Plan.

It is further ORDERED that the Plan, as modified in accordance with this Order, is approved, and is preliminarily approved in this and all other respects.

In addition to any and all notice required on preliminary approval of the Plan, the Rehabilitator shall serve a copy of this Order and the accompanying opinion on counsel for the Policyholders' Committee and on the other individual objectors and their counsel.